**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

WILLIE JOE HALL, and
GLENDA HALL,

    Plaintiffs,

                                              Case No. 10-11200

v.

                                              HONORABLE DENISE PAGE HOOD

ROSEANNE HOPPER,
AARON SHREWSBURY,
GREGORY HENKE,
JENNIFER CATNER, and
CITY OF TAYLOR

    Defendants.
_____/

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

This matter is before the Court on Defendants' Motion for Summary Judgment **[Docket No. 17, filed on February 28, 2011]**. Plaintiffs filed a response in opposition on March 20, 2011 **[Docket No. 20]**, to which Defendants replied **[Docket No. 25, filed on March 28, 2011]**.

**II.    STATEMENT OF FACTS**

On July 30, 2009, Plaintiff Glenda Hall's ("Plaintiff Mrs. Hall") daughter, Tyra, and Tyra's cousin were walking to a party store. While walking to the store, a man who had previously shot at or around the girls pulled up on a blue and black motorcycle or moped, made a threatening gesture, and showed them a gun. Tyra immediately contacted Mrs. Hall, who in turn contacted Plaintiff Joe Hall ("Mr. Hall" or "Plaintiff") and the police.

1

According to Plaintiffs, Mr. Hall was practicing to receive a concealed weapons permit at Top Gun shooting range when he received the call.  He hurriedly left Top Gun, placing the handgun he had used for practice in the front seat console of his vehicle.  Defendants dispute this account, as there is no record of Mr. Hall having been at the shooting range .

Plaintiffs contend he drove to the Ponds Apartments, where he spoke to gatekeeper Dwight Bembow.  He asked Mr. Bembow if he had seen a man riding a blue or black motorcycle in or out of the apartment complex.  Hall informed Bembow that the man had shot at his daughter a week or so before, and asked Mr. Bembow to call the police if he saw him.  Mr. Hall then left the Ponds Apartments, and asked the same questions and made the same request to gatekeeper Nancy Arnold.  He then left the complex.

Ms. Arnold contacted her supervisor, who advised her to report the incident to the police. Ms. Arnold called the Taylor police, spoke with Public Service Officer (PSO) James Pilchak, and informed him that a man had pulled up to the gate, looking for "Dexter Davis and he said that if he sees them, he's going to shoot them and call the police."  Ex. 2 to Pl.'s Brief, Nancy Arnold's Telephone Call to Taylor Police.  During the same conversation, Ms. Arnold informed police that Mr. Hall (whom she did not know by name) did not identify Dexter Davis, but she immediately knew who he was referring to when he "mentioned the guy on the moped."  Arnold provided Taylor police with Mr. Hall's license plate number.  *Id.*  Plaintiffs do not dispute that Ms. Arnold provided this information, however, he contends that Ms. Arnold lied when speaking to PSO Pilchak.

PSO Pilchak reported Arnold's call to the dispatcher, Defendant Jennifer Catner ("Catner"), who sent a radio message conveying the information provided by Ms. Arnold to the

2

road officers. The radio message erroneously stated that Mr. Hall arrived at the Ponds, rather than the Parks, and the dispatcher made the statement "We're assuming he's armed since he is threatening to shoot Mr. Davis." *Id.* According to Defendants, officers began to look for the described vehicle, heading toward the residence of Dexter Davis. Other officers went to Ms. Arnold, who confirmed the information she had previously provided.

Defendants maintain that Officer Gregory Henke saw a car matching the provided description on Goddard Road, driven by an African-American male, later identified as Mr. Hall. Henke sent a radio message that he saw the car, provided a description of the driver, and confirmed the license plate number. Officers Aaron Shrewsbury, Henke, and Roseanne Hopper claim that the driver then began to take evasive and/or nervous actions, and pulled the car over into the parking lot of the Get'N'Go Store.

Plaintiffs contend Mr. Hall was driving back toward his own home, and moved to the right lane on Goddard (traveling westbound) in order to stop at the Get'N'Go store to purchase some soda. After changing lanes, he stopped at a red light and police officers pulled in behind him. When the light turned green, Mr. Hall proceeded through the intersection and was pulled over in the parking lot of the Get'N'Go store.

Police ordered Mr. Hall to place his hands outside of the window. Plaintiffs state Mr. Hall was ordered out of the car at gunpoint and handcuffed.[1] According to Mr. Hall, Officer Hopper approached his car and began searching it without Mr. Hall's permission. Mr. Hall was asked whether he had any weapons, and Mr. Hall informed the officers of the gun in the console

---

[1] The time at which Mr. Hall was handcuffed is disputed. According to Plaintiffs, he was handcuffed immediately after being ordered out of the car. According to Defendants, he was handcuffed after being arrested for carrying a concealed weapon.

and a gun in the trunk without ammunition.  Officer Hopper recovered a loaded gun from the console and a gun from the trunk, for which Mr. Hall had no permit.

Defendants allege that the only contact Mr. Hall had with Officer Shrewsbury was bas he was being handcuffed, placed in the car, and transported to the jail.  Defendants further state that Mr. Hall never had any contact with Officers Catner, Hopper, and Henke.

Mr. Hall states that he was transported to the Taylor Police Department shortly after 8:00p.m., but was not allowed to make a telephone call and was not advised of his Miranda rights until the next day (approximately sixteen hours later, when he was interviewed by Detective Schwein).  Defendants contend Mr. Hall informed Detective Schwein that he drove to the Parks and Ponds apartments in search of the man who approached his daughter, because he wanted to find out who he was.  Hall said he forgot he had the loaded gun in his car.  He was arraigned on August 1, 2009 on the carrying a concealed weapon change and released on a $5,000 bond.

On October 7, 2009, at the preliminary hearing, Ms. Arnold testified that Mr. Hall never threatened to shoot Dexter Davis, but instead made a statement that she interpreted to mean that if the police did not get Mr. Davis, Mr. Hall would.  On December 11, 2009, Judge Thomas E. Jackson of the Criminal Division of the Wayne County Circuit Court granted Mr. Hall's motion to suppress evidence (any items found in the car and any statements made by Mr. Hall), finding that there was no probable cause to stop Mr. Hall or to conduct a search and seizure.  After a motion for reconsideration, the criminal charges were dismissed and there was no appeal.

Plaintiffs now bring this action, asserting claims under 42 U.S.C. §1983 and various state laws.

### III.  APPLICABLE LAW & ANALYSIS

####    A.  Legal Standard for Summary Judgment

Pursuant to Rule 56(c), summary judgment may only be granted in cases where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  The moving party bears the burden of showing no dispute as to any material issue.  *Equal Employment Opportunity Comm'n v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1093 (6th Cir. 1974).  A dispute must be evident from the evidence in order to deny such a motion.  Such a dispute must not merely rest upon the allegations or denials in the pleadings, but instead must be established by affidavits or other documentary evidence.  Fed. R. Civ. P. 56(e).  When ruling, the Court must consider the admissible evidence in the light most favorable to the non-moving party.  *Sagan v. United States of Am.*, 342 F.3d 493, 497 (6th Cir. 2003).

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added).  To create a genuine issue of material fact, the nonmovant must do more than present "some evidence" of a disputed fact.  "If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).  Accordingly, a nonmovant "must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact."  *Mathieu v. Chun*, 828 F. Supp. 495, 497 (E.D. Mich. 1993) (citations omitted).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no

5

reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott*, 550 U.S. at 380.

      **B.**      **Qualified Immunity**

Governmental officials are entitled to qualified immunity when their discretionary acts do "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1992). The Supreme Court has set forth a two-part test to determine whether qualified immunity should attach. First, the court must decide whether, in the light most favorable to the party asserting the injury, the facts alleged show the official's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If there is no such violation, the inquiry ends here. *Id*. If a violation can be adequately stated, the court next asks whether the right was clearly established. *Id*. Providing guidance in determining whether a right was clearly established, the Court stated, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable offic[ial] that his conduct was unlawful in the situation he confronted**."** *Id*. *Saucier* also provides that an official's reasonable mistake is still cloaked with immunity. *Id*. Plaintiffs must show that the officers violated a right so clearly established that any official in Defendants' positions would have understood that they were under an affirmative duty to refrain from such conduct. *Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir. 1988), *cert. denied*, 488 U.S. 1007 (1989). In other words, Plaintiffs must demonstrate that Defendants conduct was objectively unreasonable in light of Plaintiffs' clearly established rights. *See Williams v. Mehra*, 186 F. 3d 685, 691 (6th Cir. 1999).

Once Defendants have provided facts showing that the officers were acting within the

scope of their authority, the burden of demonstrating that qualified immunity is inappropriate falls on the shoulders of Plaintiffs. *See, e.g., Sheets v. Mullins*, 287 F.3d 581 (6th Cir. 2002). Plaintiffs must show that the officers violated a right so clearly established that any official in Defendant officers' positions would have understood that they were under an affirmative duty to refrain from such conduct. *Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir. 1988), *cert. denied*, 488 U.S. 1007 (1989).

Immunity is afforded even if law enforcement officials "'reasonably but mistakenly conclude that probable cause is present.'" *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (*quoting Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). The Supreme Court has further stated that probable cause to arrest existed if "'at the moment the arrest was made . . . the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing'" that a crime occurred. *Hunter*, 502 U .S. at 228 (*quoting Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Again, the focus, for purposes of qualified immunity, is on the objective legal reasonableness of the official's actions in light of clearly established law. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Garvie v. Jackson,* 845 F.2d 647, 649 (6th Cir. 1988).

Mr. Hall's criminal case for the underlying alleged crime was dismissed after the Honorable Thomas E. Jackson of the Criminal Division of the Wayne County Circuit Court granted a motion to suppress, and denied a motion for reconsideration by the prosecution, on the basis that there was no probable cause in this case. Viewing the facts in the light most favorable to the party asserting the injury, there is, at a minimum, a genuine issue of material fact as to whether the officers had probable cause to stop Mr. Hall from the outset. In her telephone call to

the Taylor police, Nancy Arnold made no mention that Mr. Hall was armed. Ms. Arnold stated that Mr. Hall never identified Dexter Davis by name. The admissibility of evidence uncovered from a search relying on a radio bulletin, "its admissibility turns on whether the officers who *issued* the flyer [or bulletin] possessed probable cause to make the arrest. It does not turn on whether those relying on the flyer [or bulletin] were themselves aware of the specific facts which led their colleagues to seek their assistance." *United States v. Hensly*, 105 S.Ct. 675, 681 (1985); *see also Feathers v. Aey*, 319 F.3d 843, 849 (6th Cir. 2003). Even if the police relied on Corporal Catner's dispatch, that is insufficient to establish probable cause, as Corporal Catner lacked probable cause.

Even under the more permissive standard set forth in *Terry v. Ohio*, under which a person may be stopped in the absence of probable cause, an officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." 392 U.S. 1, 21 (1968). In this case, such articulable and specific facts do not exist. Instead, the officers were acting on the "inarticulate hunch" that Mr. Hall was armed and engaged in criminal activity, based upon the assumptions of both Nancy Arnold and Corporal Catner. When viewing the facts in the light most favorable to Plaintiffs, a question of fact exists as to whether the officers had qualified immunity.

To determine whether qualified immunity attaches, the Court must also determine whether Mr. Hall's constitutional rights were clearly established. It is clearly established that, under the Fourth Amendment to the Constitution, Mr. Hall has a right to be free from unreasonable searches and seizures in their persons, houses, papers, and effects. *Hensley*, 105 S.Ct. at 678-9. Taking all facts in the light most favorable to Mr. Hall, there is a genuine issue of

material fact as to whether any officer should have understood that she had an affirmative duty to refrain from the illegal stop of Mr. Hall and the illegal search of his vehicle. For the aforementioned reasons, summary judgment is not appropriate on the issue of qualified immunity.

### C. Municipal Liability

To establish municipal liability, a plaintiff first must establish that a constitutional violation has occurred. *Lewellen v. Metropolitan Gov't of Nashville and Davidson County, Tennessee*, 34 F.3d 345, 350 (6th Cir. 1994). After this is established, a municipality will be liable if the constitutional violation was a result of the municipality's custom or policy. *Monell v. New York City Dept. of Soc. Serv.*, 436 U.S. 658 (1978). Liability can also be premised on a municipality's or county's failure to train its officers demonstrates a risk that is "so obvious as to constitute deliberate indifference to the rights of its citizens." *Gray v. City of Detroit*, 399 F. 3d 612, 618 (6th Cir. 2005); *See also City of Canton v. Harris*, 489 U.S. 378, 390 (1989)("[T]he need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.").

A municipality can be liable under § 1983 only where "its policies are the moving force behind the constitutional violation." *Id.* at 388 (1989). There must be "a direct causal link between a municipal policy or custom and the alleged constitutional violation. *Id.* at 385. It is true that,

> "[w]hile officials may not be liable under section 1983 because their actions (or failure to act) were not constitutional violations according to clearly established law at the time the actions took place, a municipality may nevertheless be liable if the actions complained of rise to the level of constitutional violations in light of

> present law. Stated another way, it is possible that city officials may be entitled to qualified immunity for certain actions while the municipality may nevertheless be held liable for the same actions.

*Barber v. City of Salem*, 953 F. 2d 232, 237-38 (6th Cir. 1992)(Internal citations omitted).

Further, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Oklahoma City v. Tuttle,* 471 U.S. 808, 823-824 (1985).

As discussed above, there exists a genuine issue of material fact as to whether a constitutional violation occurred. For municipal liability to attach, however, Mr. Hall must demonstrate that the violation resulted from the municipality's custom or policy. A party may demonstrate an unlawful policy or custom by showing a policy of inadequate training or supervision. *See Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992). To make out a claim for municipal liability based on failure to train or supervise, there are "three distinct facts which the plaintiff must prove: that a training program is inadequate to the tasks that the officers must perform; that the inadequacy is the result of the city's deliberate indifference; and that the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury." *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989). Additionally, such a failure must "amount[] to deliberate indifference to the rights of persons with whom the police came into contact." *Id.* (internal citations omitted).

Plaintiffs argue that Defendant Catner dispatched without supervision, and she alone made the erroneous dispatch. Accepting the Plaintiff's version of facts for the purposes of this motion, Plaintiff provides nothing to suggest to this Court that Defendant Catner was or should

10

have been required to seek permission from a higher ranking officer prior to making a dispatch. Even assuming Corporal Catner should have sought review prior to making the dispatch, there is no evidence indicating that a failure to require her to do so amounts to a deliberate indifference to the rights of others. As there is no genuine issue of material of fact as to whether municipal liability should attach, summary judgment in favor of Defendant City of Taylor is proper on this issue, and the City of Taylor must be dismissed.

### D.   Defamation

Under Michigan law, "the elements of a defamation claim are: (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication." *Mitan v. Campbell*, 706 N.W.2d 421 (Mich. 2005). "[T]ruth is an absolute defense to a defamation claim." *Porter v. Royal Oak*, 214 Mich. App. 478, 486 (1995). In order for a defamation claim to succeed, there must be material falsity. *Koniak v. Heritage Newspapers, Inc.*, 198 Mich. App. 577, 579-580 (1993).

Defendant argues that there was no false and defamatory statement made, as Defendant Catner dispatched the same information provided by Nancy Arnold. Plaintiffs argue Defendant Catner is liable for defamation because of her statement, "we're assuming he's armed since he is threatening to shoot Mr. Davis." According to Mr. Hall, he was unarmed and had not threatened to shoot. Plaintiffs do not dispute that Nancy Arnold informed Defendant Catner that Mr. Hall threatened to shoot Mr. Davis. While it may not provide probable cause or reasonable suspicion, Defendant Catner's dispatch relaying information that was indisputably called into the station

does not amount to negligence. Defendant Catner's statement that they are "assuming he was armed" was true, as, regardless of the validity of the assumption, the officers were assuming he was armed. As there is no genuine issue of material fact as to whether Defendants were negligent, Defendants are entitled to summary judgment on the defamation claim.

E. **Malicious Prosecution**

A malicious prosecution claim brought pursuant to section 1983 must be based upon the Fourth Amendment. *See Spurlock v. Satterfield*, 167 F. 3d 995, 1006 n. 19 (6th Cir. 1999).[2] A police officer cannot be liable for alleged malicious prosecution when the officer did not make the decision to bring charges. *See Skousen v. Brighton High Sch.*, 305 F. 3d 520, 529 (6th Cir. 2002). In *Skousen*, the court held that the plaintiff's malicious prosecution claim failed because the plaintiff "offered no evidence . . . supporting her claim that [the defendant] caused her to be prosecuted," and there was "no evidence that [the defendant] made or even was consulted with regard to the decision to prosecute [the plaintiff]." *Id.* at 529. Plaintiffs have not provided this Court with any evidence establishing a genuine issue of fact that any Defendants made or were consulted with in regard to the charges brought against Mr. Hall. Plaintiffs' Fourth Amendment malicious prosecution claim is dismissed.

---

[2] The Court notes that there appears to be some conflict within this circuit regarding the state of section 1983 malicious prosecution claims. *Id.* (finding that the Supreme Court's decision in *Albright v. Oliver*, 510 U.S. 266 (1994) authorizes a Fourth Amendment malicious prosecution claim); *See also*, *Frantz v. Village of Bradford*, 245 F. 3d 869 (6th Cir. 2001) (holding that *Albright* does not authorize a separate claim of malicious prosecution independent of the underlying illegal seizure claim). The Sixth Circuit in *Darrah v. City of Oak Park*, noted that "when a later decision of this court conflicts with one of our prior published decisions, we are still bound by the holding of the earlier case." 255 F. 3d 301, 310 (6th Cir. 2002) ("We are not bound by the *Frantz* court's interpretation of *Spurlock* . . .[n]o new Supreme Court case justified the *Frantz* court's decision to disregard *Spurlock*." *Id.* at 312 n. 4. As such, this Court concludes that *Albright* authorizes a Fourth Amendment malicious prosecution claim.

Plaintiffs likewise cannot establish a state claim of malicious prosecution. To sustain a claim of malicious prosecution of a civil proceeding the plaintiff must show: (1) the prior proceedings terminated in favor of the present plaintiff; (2) the absence of probable cause for the prior proceedings; (3) malice or showing that the proceedings were filed for a purpose other than to secure the proper adjudication of the claim; and (4) special injury stemming directly from the prior proceedings. *Dupis v. Kemp*, 2006 WL 401125 *1 (Mich.App. Feb. 21, 2006), *see also Young v. Motor City Apartments Limited Dividend Housing Association No. 1 and No. 2*, 133 Mich.App. 671, 675 (1984). Plaintiffs cannot show any genuine issue of material fact as to whether Defendants were involved in bringing the charge against Mr. Hall and his federal malicious prosecution claim also fails.

### F. False Arrest/False Imprisonment

"A false arrest is an illegal or unjustified arrest, and the guilt or innocence of the person arrested is irrelevant. To prevail on a claim of false arrest or false imprisonment, a plaintiff must show that the arrest was not legal, i.e., the arrest was not based on probable cause. If the arrest was legal, there has not been a false arrest or a false imprisonment."[3] *Peterson Novelties, Inc. v. City of Berkeley*, 259 Mich.App. 18 (Mich.App. 2003).

To sustain a claim of false imprisonment, three elements must be met. These elements are "(1) an act committed with the intention of confining another, (2) the act directly or

---

[3] "A person who is falsely arrested is at the **same** time falsely imprisoned, and an unlawful arrest may give rise to a cause of action for either **false arrest** or **false imprisonment**. Thus, it has been stated that false arrest and false imprisonment are not separate torts, and that a false arrest is one way to commit false imprisonment; since an arrest always involves a restratit, it always involves imprisonment." *Peterson Novelties*, 259 Mich. App. at 18, n.5 (emphasis in original) (internal citations omitted).

indirectly results in such confinement, and (3) the person confined is conscious of confinement." *Walsh v. Taylor*, 263 Mich.App. 618, 627 (Mich.App. 2004). The confinement must also "have occurred without probable cause to support it." *Id.*, citing *Peterson Novelties, Inc. v. Berkley*, 259 Mich.App.1, 18 (Mich.App. 2003) (internal citations omitted).

Defendants do not argue that Mr. Hall was not confined, but that Defendants had probable cause. As discussed above, there is a genuine issue of material fact as to whether probable cause existed for the arrest, raising a question as to whether Mr. Hall's arrest was legal. Summary judgment on the issue of false imprisonment is improper.

## G.     Loss of Consortium

"Loss of consortium is typically construed to encompass two aspects of the marital relationship–the loss of support and the loss of society." *Thorn v. Mercy Memorial Hospital Corporation*, 761 N.W.2d 414, 424 (Mich.App. 2008). While it technically refers to the loss of conjugal fellowship, "it is legally recognized as including loss of society, companionship, service, and all other incidents of the marriage relationship." *Id.* at 424-425.

Mrs. Hall claims loss of consortium, arguing that after Mr. Hall was arrested, he was forced to leave the family home and contemplate divorce to ensure that the Halls' two foster care children were not removed from the home. Mr. and Mrs. Hall also argue that their sexual relationship has been adversely affected by Mr. Hall's arrest. Under Michigan law, loss of consortium is a derivative claim, which "stands or falls on the primary claims in the complaint." *Kohler v. North Star Steel Co.*, 408 F.Supp.2d. 380, 386-387 (E.D. Mich. 2005). As the Court has found genuine issues of material fact relative to other claims in the complaint, summary judgment is inappropriate on the loss of consortium claim.

### H.      Gross Negligence/Governmental Immunity

The Michigan Governmental Immunity Act provides:

(1) Except as otherwise provided in this act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function....

(2) Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency, each volunteer acting on behalf of a governmental agency, and each member of a board, council, commission, or statutorily created task force of a governmental agency is immune from tort liability for an injury to a person or damage to property caused by the officer, employee, or member while in the course of employment or service or caused by the volunteer while acting on behalf of a governmental agency if all of the following are met:

>    (a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.
>    (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
>    (c) The officer's employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage.

MICH. COMP. LAWS § 691.1407(1)-(2)(c). The Act defines gross negligence as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MICH. COMP. LAWS § 691.1407(2); *See also, Tarlea v. Crabtree*, 263 Mich. App. 80, 82; 687 N.W.2d 333 (2004).   No liability attaches unless the Defendants' actions were the proximate cause of the injury. *Id.*   Gross negligence will be found "if an objective observer watched the actor, he could conclude reasonably, that the actor simply did not care about the safety or welfare of those in his charge." *Tarlea*, 263 Mich. App. at 90.

Under Michigan law, to be immune from liability for intentional torts, a "governmental employee must also establish he was acting in 'good faith'." *Odom v. Wayne County, et al.*, 482

15

Mich. 459, 473 (2008).  "[T]here is no immunity when the governmental employee acts *maliciously* or with a *wanton or reckless disregard of the rights of another.*"  *Id.*   "[A] police officer is entitled to immunity when he is acting in good faith with probable cause . . . even though the arrest is subsequently found to be baseless."  *Id.* at 474.

Defendants argue that the officers were acting in good faith.  There is a genuine issue of material fact as to whether the officers were acting with probable cause or reasonable suspicion.  Taking all facts in the light most favorable to Plaintiffs, there is a genuine issue of material fact as to whether the officers were acting in good faith.  Summary judgment on the issue of governmental immunity is improper.

IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment **[Docket No. 17, filed on February 28, 2011]** is **GRANTED IN PART** (with respect to Plaintiffs' claims for municipal liability, defamation, and malicious prosecution) **AND DENIED IN PART** (with respect to all other claims).

**IT IS FURTHER ORDERED** that Defendant City of Taylor is **DISMISSED**.


Dated:  August 19, 2011           S/Denise Page Hood
                                  DENISE PAGE HOOD
                                  UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, August 19, 2011, by electronic and/or ordinary mail.

                                   s/Julie Owens
                                  Case Manager, (313) 234-5160